**TRANSOURCE INTERNATIONAL, INC.,
et al., Plaintiffs-Appellants,**

**v.**

**TRINITY INDUSTRIES, INC., a Texas
corporation, Defendant-Appellee.**

No. 83–1009.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1984.

Judge, Russ & Clark, Philip R. Russ, Amarillo, Tex., for plaintiffs-appellants.

Locke, Purnell, Boren, Laney & Neely, W. Andrew Barr, Michael H. Collins, Dallas, Tex., for defendant-appellee.

Before POLITZ, JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This is an appeal from a summary judgment in an antitrust and breach of contract suit. Appellant, Transource International, Inc., a railcar manufacturer, sued Trinity Industries, Inc., a railcar marketer, claiming (1) that Trinity conspired with other railcar manufacturers and dealers to boycott Transource and eliminate it from competition in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970), section 3 of the Clayton Act, 15 U.S.C. § 14 (1970), and section 15.01 of the Texas antitrust laws, TEX.BUS. & COM.CODE ANN. § 15.01 (Vernon 1968); (2) that Trinity violated section 2 of the Sherman Act by monopolizing or attempting to monopolize the railcar market; and (3) that Trinity violated section 1 of the Sherman Act and section 3 of the Clayton Act by contractually eliminating competition by Transource through use of a non-competition clause. In addition, Transource claimed that Trinity breached its railcar manufacturing and marketing contract with Transource. The district court granted a summary judgment in favor of Trinity on all counts and Transource appeals.

We find that the district court's summary judgment on the antitrust claims should be affirmed. The summary judgment on the state law claim of breach of contract, however, we find to have been in error because that issue should have been submitted to the jury. We therefore vacate the district court judgment as to the breach of contract claim and remand the case to the district court for further proceedings.

## FACTS

Plaintiff, Transource International, was formed in May 1979, by Rose, Cogliatti & Garrison, three former employees of ITEL Corporation, a company in the business of procuring and leasing railcars throughout the United States.[1]

Acting as agents for the newly formed corporation, the three principals contacted the defendant-appellee, Trinity, Inc., a manufacturer and marketer of a wide variety of steel products, including railcars. The Transource principals proposed that the two corporations combine Transource's marketing expertise and Trinity's manufacturing expertise to form a joint venture for the purpose of manufacturing and distributing railroad gondola cars.

On June 15, 1979, Trinity and Transource executed an agreement entitled "Railcar Manufacturing and Marketing Agreement" (June 15, 1979, Agreement). Under this contract, Transource agreed to assign valid and binding purchase orders for railcar components to Trinity at closing and agreed that upon this assignment Trinity would succeed to all rights and obligations under the purchase orders. Next, Transource

---

1. Prior to forming Transource, the three principals had created another company, Transource-Delaware with the intention of assembling and leasing boxcars. The Trans-Del principals negotiated with vendors for railcar components, but before any components were acquired, the corporation collapsed due to lack of financial support.

agreed to secure an initial order for the purchase of 250 gondolas and to assign this order to Trinity prior to June 30, 1979.[2] In addition, since Transource only had $1,000 in its corporate capital account at this time, Trinity agreed to loan $20,000 working capital to Transource each month for eight months and agreed to pay the June advance to Transource upon closing. Finally, Transource and its shareholders agreed to include a non-competition and conflict of interest clause in the contract which provided that Transource and its shareholders would not compete with Trinity in the marketing or manufacturing of railcars during the term of the agreement.

Among the railcar component purchase orders which Transource agreed to assign to Trinity under the agreement was an order for 585 sets of wheels and axles issued by Transource to the Valdunes Division of Creusot-Loire Steel Corporation. The enforceability of the Valdunes purchase order was contingent upon the posting of a $2,070,000 letter of credit in favor of Valdunes by June 15, 1979, which was the same day the Trinity-Transource Agreement was executed.[3]

The responsibility for posting the Valdunes letter of credit is the major conflict in this case. Transource maintains that Trinity obligated itself to post the letter of credit as part of the Trinity-Transource Agreement. Trinity, however, contends that the June 15, 1979, Agreement constituted the entire contract between the parties and that the Agreement contained no provision obligating Trinity to post the Valdunes letter of credit. In any event, on the afternoon of June 15, 1979, after executing the Agreement with Transource, Trinity did contact its bank in an effort to have the Valdunes letter of credit posted. The bank, however, could not complete the letter of credit process that afternoon. When the letter of credit was not delivered as promised on June 15, 1979, Valdunes cancelled

Transource's purchase order for wheels and axles. At this point, since Transource could not meet its obligations under the Agreement to provide the Valdunes purchase orders, Trinity refused to give Transource the $20,000 advance.

On July 2, 1979, Trinity notified Transource by letter that it considered the June 15, 1979, Agreement null and void. Subsequently, Trinity and Transource entered into a second contract in which Trinity agreed to sell 250 gondolas to Transource for $35,000 each. This agreement (July 6, 1979, Agreement) provided that all customer acceptance and financial arrangements were to be completed by September 28, 1979. Transource failed to complete financial arrangements by September 28, 1979, however, and at this point, negotiations between Trinity and Transource ended.

Thereafter, Transource filed a complaint in federal district court alleging several violations of antitrust laws. First, Transource asserted that the non-competition clause in Paragraph 8 of their June 15, 1979, Agreement with Trinity constituted an unlawful restraint of trade in violation of section 1 of the Sherman Act. Next, Transource claimed that Trinity conspired with its manufacturers and suppliers to keep Transource out of the business of manufacturing and leasing gondolas, and that this conspiracy monopolized trade in violation of sections 1 and 2 of the Sherman Act. Transource also alleged that Trinity violated section 3 of the Clayton Act because it had refused to allow Transource to sell its right to purchase gondolas to another railcar leasing company and that the non-competition clause in Paragraph 8 of the Agreement violated section 3 of the Clayton Act as well. In addition to its federal claims, Transource also complained that the June 15, 1979, Agreement violated Texas antitrust laws. Finally, Transource maintained that Trinity breached the Agreement itself by failing to post the Valdunes letter of credit and by

---

2. After this initial order, Transource had the option under the contract to secure purchasers for up to 450 more gondolas, and would receive $600 in sales commission per car.

3. Valdunes had informed Transource that the purchase order would be cancelled unless the letter of credit was posted by June 15, 1979.

failing to advance the $20,000 to Transource at closing. Both parties filed motions for summary judgment. The district court granted defendant Trinity's motion and ordered that Transource take nothing. This appeal followed.

### I. Summary Judgment

■ Summary judgment is "drastic relief" and must be approached cautiously. *Solomon v. Houston Corrugated Box Co., Inc.,* 526 F.2d 389, 393 (5th Cir.1976). This is especially true with respect to complex antitrust cases where summary judgment is not generally favored. *Ibid.*[4] Summary judgment should be entered only if when viewing the evidence in a light most favorable to the non-moving party, it appears from the pleadings, depositions, answers to interrogatories, admissions and affidavits that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), *see, e.g., Poller v. Columbia Broadcasting System,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).

■ Despite this strict standard, however, summary judgment is sometimes appropriate in antitrust actions. "It is now established that 'simply because a suit is brought under the antitrust laws does not foreclose a summary judgment.' " *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436, 440 (5th Cir.1982), *citing, Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1112 (5th Cir.1979). While the court must draw all inferences in favor of the party opposing summary judgment, the nonmoving litigant cannot establish a genuine issue of material fact merely by introducing conflicting testimony. On the contrary, "[t]his Court recognizes that once defendants have made ... sworn denials, summary judgment is appropriate unless plaintiff can produce *significant evidence* demonstrating the existence of a genuine fact issue." *Parsons v. Ford Motor Co.,* 669 F.2d 308, 313 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). (emphasis added). The trial court in this case rendered summary judgment in favor of defendant Trinity as it found that the plaintiff failed to introduce evidence which created a genuine factual dispute regarding any of its claims. In reviewing a summary judgment on appeal, we are bound by the same standard that controls the district court. *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir. 1981).

### II. Restraint of Trade

Transource claims that Paragraph 8 of the June 15, 1979, Agreement constitutes an unlawful restraint of trade against Transource under section 1 of the Sherman Act. Under Paragraph 8, Transource agreed to refrain from competing with Trinity in the manufacture or marketing of railcars during the term of the Agreement or for five years after termination of the Agreement. Transource claims that Paragraph 8 prevented it from becoming either a competitor of Trinity, or a customer of Trinity's competitors. It urges that it was thus unlawfully eliminated from the railcar market.

Under section 1 of the Sherman Act, contracts, combinations, and conspiracies in restraint of trade may be either horizontal or vertical. *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981). Horizontal combinations are agreements among actual competitors which restrain competition at the same level of distribution. These types of agreements are ordinarily considered illegal per se, "because of their pernicious effect on competition and lack of any redeeming virtue" and "are conclusively presumed to be illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Vertical restraints, however,

---

**4.** "The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances." *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1111 (5th Cir. 1979).

are those imposed by persons further up the chain of distribution,[5] and are tested by the "rule of reason." Under this analysis, the plaintiff is required to prove an anticompetitive effect in order to prevail. *Muenster Butane, Inc. v. Stewart Co., supra* at 295.

### A. *Per Se Restraint of Trade*

Transource first contends that Paragraph 8 was a horizontal restraint of trade and thus constituted a per se violation of section 1. The district court, however, found that Transource and Trinity were not horizontal competitors. Transource objects to the district court's characterization of their relationship, and claims that in any event, the district court erred by not submitting the issue of characterization to the jury.

■ First, we find under this record that it is clear the district court correctly concluded that Transource and Trinity were not horizontal competitors at the time of the contract. As the district court explained, Transource's business at this time was the sale of distribution services while Trinity's was manufacturing railcars.

■ Second, we consider the question whether Transource could have been viewed as a *potential* competitor at the time of the contract, since agreements not to compete among potential competitors are also illegal per se. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973). We agree with the district court's conclusion on this point as well. Independently, Transource lacked the financial ability to enter the market at the same level as Trinity and could not have been considered a potential competitor. As the district court noted, the record contains evidence regarding Rose, Cogliatti and Garrison's previous failure in the railcar manufacturing business through Transource-Delaware. The record also contains evidence that Transource's assets were limited to $1,000. Further, even Transource conceded that without the Trinity-Transource Agreement, Transource could not exist as a viable

economic entity. For these reasons, we conclude that there was adequate support in the record for the district court to rule as a matter of law that Paragraph 8 of the Agreement did not constitute a per se violation of section 1 of the Sherman Act as a horizontal restraint.

### B. *Rule of Reason Analysis*

■ Since we conclude that Transource and Trinity were vertical, and not horizontal competitors, any allegation of antitrust violations must be analyzed under the "rule of reason." *Muenster Butane, supra* at 295.

■ Before reaching any substantive issues in plaintiff's claim, however, we must establish whether plaintiff had standing to maintain this claim under the Sherman Act. "The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint." *In Re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1168 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). To attain standing in claiming an antitrust rule of reason violation, the plaintiff must allege three factors in its complaint. First, the plaintiff must allege that it is one against whom the competitive restraints are targeted. Second, the plaintiff must allege a concrete injury. Finally, the plaintiff must demonstrate in the complaint that there is a connection between the alleged injury and the violation. We have examined plaintiff's complaint with these requirements in mind and conclude that it lacks the requisite standing to sue under the Sherman Act on its claim that Paragraph 8 of the Agreement violates the Act.

■ As the district court noted, it is clear in this case that the plaintiff met the "target market" aspect of the standing test. Transource alleged that the provisions of Paragraph 8 of the Agreement were intended to prevent Transource from competing with Trinity. This allegation suffices to demonstrate that the plaintiff was "within that sector of the economy which is endan-

---

**5.** In rare cases, vertical restraints are imposed by persons further down the chain of distribu-

tion. *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981).

gered by a breakdown of competitive conditions in a particular industry." *Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir.1975). The plaintiff also adequately alleged damages in its complaint—the second requirement for standing.

■ Plaintiff failed, however, to establish the third standing requirement. Although Transource alleged injury, *i.e.* increase in the cost of railcars, elimination of Transource from the marketplace, loss of sales, purchase orders, future profits, credits and commissions, it failed to allege a sufficient causal relationship between the injury and antitrust violation. *See, Associated General Contractors of California, Inc. v. California State Council of Carpenters,* — U.S. —, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).[6] Instead, Transource merely complained that "Trinity unlawfully and unreasonably in restraint of trade, required Transource to refrain from competing with Trinity ..." We cannot conclude from this allegation alone that any injuries could have resulted flowing from Paragraph 8 of the June 15, 1979, Agreement. As the district court stated in its Memorandum Opinion:

> There is absolutely no allegation Transource, Rose, Cogliati or Garrison had an opportunity to manufacture railcars or gondolas which Trinity prevented by enforcing Paragraph 8 nor is there any allegation Transource, Rose, Cogliati or Garrison had an opportunity to market railcars or gondolas for another manufacturer which Trinity prevented by enforcing Paragraph 8.

Significantly, Transource did not rebut or even address in its pleadings the sworn statement by Trinity that Paragraph 8 was never enforced. Since Transource failed to allege a causal relationship between the injuries and the violation, it has no standing

on that basis to maintain a suit under section 1 of the Sherman Act based upon Paragraph 8 of the Agreement.

## III. Conspiracy

■ Transource contends that there was sufficient evidence before the district court to support the possibility of a conspiracy by Trinity and other leasing subsidiaries and competitors to drive Transource out of the gondola manufacturing and leasing market. The alleged conspiratorial acts included (1) refusal to deal with Transource on the part not only of Trinity but also of Trinity's leasing subsidiary and certain potential buyers and lessees of Trinity's gondolas and (2) termination of the June 15, 1979, Agreement by Trinity and interference in Transource's performance of the July 6, 1979 Agreement.

In response to this allegation, and in support of its own motion for summary judgment, Trinity submitted a sworn denial that any conspiracy existed as well as other affirmative evidence rebutting the claim. The district court concluded that the plaintiff had failed in its effort to rebut defendant's motion for summary judgment on the conspiracy claims, and we agree.

Plaintiff's allegation of a refusal to deal by Trinity and other unnamed co-conspirators was insufficient to raise a fact issue. As the district court noted, "the mere recitation of facts suggesting a parallel refusal to deal has no significant probative force where the defendants can fully explain how independent business judgment would have led to such a refusal ..." *Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 494 (5th Cir.1982). Trinity offered reasonable business explanations for bypassing Transource in its transactions with purchasers and lessees of its products. First, Trinity claimed that it was not bound by the Agreement at all since the Agreement fell apart the same day it was signed. In addi-

---

**6.** The Supreme Court has noted that the doctrine of "antitrust standing" differs from standing as a constitutional doctrine. Harm to the plaintiff satisfies the constitutional requirements of injury in fact. Under antitrust law, however, the court must also determine that the plaintiff is a proper party to bring an antitrust action. In this case, our focus is constitutional since the plaintiff did not even show any injury which resulted from the allegedly illegal action.

tion, Trinity contended that the June 15, 1979, Agreement did not control the particular transactions in question because Trinity had entered into those dealings prior to signing the Agreement. Further, Trinity explained that it was not obligated to negotiate through Transource by the July 6, 1979, Agreement, as that contract merely anticipated the outright sale of 250 gondolas to Transource. Since Trinity supports these contentions with plausible business explanations and Transource makes no specific refutation, we cannot draw an inference of conspiracy from the mere allegation without more that Trinity negotiated independently with purchasers and lessees of their products.

### IV. Monopoly

Transource argues that the district court erred in granting summary judgment for Trinity on plaintiff's claims of monopolization or attempted monopolization of the gondola distribution market under section 2 of the Sherman Act.

In order to prove illegal monopolization under section 2, a plaintiff must demonstrate (1) that the defendant possessed monopoly power in the relevant market and (2) that the defendant willfully acquired or maintained that power, as distinguished from its occurrence as the result of mere growth or development. *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Mid-Texas Communications System, Inc. v. American Telephone and Telegraph Co.*, 615 F.2d 1372, 1385–86 (5th Cir.), *cert. denied sub. nom., Woodlands Telecommunications Corp. v. Southwestern Bell Telephone Co.*, 444

U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).

Attempted monopolization also has two elements. Under its claim the plaintiff must demonstrate that: (1) Trinity had the specific intent to accomplish the illegal result and (2) there was a dangerous probability that the attempt would have been successful. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

Since section 2 is based on control of the "relevant market," our first task is to define that market for purposes of this case.[7] Transource advances the somewhat unusual contention that the relevant product market is limited to gondola railcars manufactured by Trinity in the continental United States, and that under this measure, Trinity controls 100% of the market.[8] Trinity urges instead that the relevant market cannot be composed of its products alone, but must include as well all other railcars and gondolas manufactured in the United States.

In *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956), the Supreme Court stated:

"one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the

---

**7.** Analysis of the relevant market is required in "attempt to monopolize" cases as well as in actual monopolization cases since "dangerous probability of success" means "dangerous probability of monopolization in a relevant market." *Dimmitt Agri Industries v. CPC Intern., Inc.*, 679 F.2d 516, 525 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983).

**8.** Transource cites *Woods Exploration Production Co. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir.1971) as support for its limited

definition of "relevant market." In *Woods,* several oil companies were charged with monopolizing the production and marketing of gas from the Appling Natural Gas Field. We held that on those facts, that the "relevant market" could be limited to that field alone. *Woods* does not control the present case, however, as it does not deal with the distribution of a product wholly owned by defendant, but instead regards the right to extraction of gas from a common gas reservoir shared with defendants.

*competitive market* for the product. (Emphasis added).

Since the *du Pont* case, courts have recognized that a manufacturer's monopoly over the distribution of its own products is not illegal. *See, e.g., Spectrofuge Corp. v. Beckman Instruments, Inc.,* supra at 282. This Court recently reaffirmed that principle in *Parsons v. Ford Motor Co.,* 669 F.2d 308 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). In *Parsons,* a case similar to the one at bar, we approved a district court's dismissal of a section 2 claim against Ford Motor Company, where the plaintiffs alleged that the company was attempting to monopolize the sale of new Ford automobiles. In affirming the dismissal, we agreed with the district court's reasoning that "every manufacturer has a natural monopoly in the sale of his own products; such natural monopolies do not contravene anti-trust laws." *Id.* at 312. *See also, Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 791 (5th Cir.1982).

■ The district court in the instant case correctly stated that although "a manufacturer who retains control over the distribution of his products might be said colloquially to have monopolized the manufacturing and marketing of that product, that is his prerogative." Thus, in reviewing the defendant's actions to determine if there has been a violation of antitrust laws, we cannot limit the relevant market to that manufacturer's product alone.[9] Instead, as Trinity asserts, the relevant market in this case must be all gondolas and railcars manufactured in this country.

■ In its motion for summary judgment on the monopolization claims, Trinity

submitted the following evidence with regard to its share of the gondola manufacturing market:[10]

1. In 1979, 1980 and 1981, Trinity delivered approximately the following percentages of all new railcars delivered in the United States: 1979—4.1%; 1980—8.3%; 1981—7.1%;

2. During the period 1979, 1980 and 1981, there were at least 23 firms in the United States which manufactured railcars;

3. In the years 1979, 1980 and 1981, Trinity delivered approximately the following percentages of new gondolas delivered in the United States: 1979 and previous years—0%; 1980—6.5%; 1981—3.8%;

4. During the period 1979, 1980 and 1981, there were at least 12 firms which delivered gondolas in the United States.

Transource did not challenge these figures. Neither did Transource offer any countering evidence to explain how Trinity could monopolize or how there could be even a "dangerous probability" of monopolization with such a low share of the relevant market.

As the district court noted, this Court recently held that "market shares in the range of 16 to 25 percent . . . are insufficient—at least absent other compelling structural evidence[11] as a matter of law to support monopolization." *Dimmitt Agri Industries v. CPC Intern., Inc.,* 679 F.2d 516, 529 (5th Cir.1982). In reaching our conclusion in *Dimmitt,* we relied on Fifth Cir-

---

9. When the manufacturer of a unique product monopolizes vertically by refusing to allow others to sell it at wholesale, it is possible to limit the "relevant market" to one manufacturer's products. *See, e.g., Eastman Kodak v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). For a more detailed explanation of this concept, *see Spectrofuge Corp. v. Beckman Instruments, supra,* 575 F.2d at 282. The common railroad gondola car is obviously not such a unique product.

10. Affidavit of L. Clark Wood, General Manager of Trinity's Railcar Division.

11. Such structural evidence might include information regarding the market's historical growth, entry barriers to the market, or relative market shares held by competitors. The plaintiffs in this case did not introduce any evidence regarding structural peculiarities of the railcar market. For an example of structural evidence, *see Fulton v. Hecht,* 580 F.2d 1243, 1246–47 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979).

cuit[12] and Supreme Court precedent[13] which make clear that "low market shares, if undisputed, make monopolization an impossibility as a matter of law." *Ibid.*

Based on the market share data presented, and the lack of any contradictory or additional evidence by Transource, we must affirm the district court's decision to grant summary judgment on the monopolization and attempted monopolization claim.

## V. Clayton Act

■ In addition to its claims under the Sherman Act, Transource also complains that Paragraph 8 of the June 15, 1979, Agreement violates section 3 of the Clayton Act. Section 3 of the Clayton Act, in pertinent part, provides that:

> It shall be unlawful for any person . . . to lease or make a sale or contract for sale of goods . . . on the condition, agreement or understanding that the *lessee* or *purchaser* thereof shall not use or deal in the goods . . . of a *competitor* or competitors of the lessor or seller where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. 15 U.S.C. § 14. (Emphasis added).

The district court granted summary judgment in favor of defendant Trinity on this claim because of its conclusion that the plaintiffs lacked standing to sue under section 3. This holding was correct. As the district court stated, under section 3 standing in terms is limited to purchasers, lessees, and competitors of the supplier. *See Southern Concrete Co. v. U.S. Steel Corp.,* 535 F.2d 313, 318 (5th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). In comparison, the June 19, 1979, Agreement did not anticipate the lease or sale of gondolas to Transource; the June contract was a gondola marketing agreement. The Agreement anticipated sales to be made by Trinity to *third parties* pursuant to contracts negotiated by Transource with such parties. Since Trinity was not involved as a seller,[14] lessor, or competitor under the June 19, 1979, Agreement it cannot maintain a cause of action under section 3.

■ Transource next asserts that Paragraph 8 of the June 19, 1979, Agreement "flowed into" the July 6, 1979, Agreement and that the latter agreement affords standing under section 3 of the Clayton Act. Transource does have standing to sue with respect to the July 6, 1979, Agreement since it was a "purchaser" under this contract. The July 6 contract, however, does not contain a noncompetition clause or any other express restraint on competition.

As the district court noted, the absence of an express exclusivity requirement does not necessarily foreclose a section 3 case. Even if a formal non-competition agreement cannot be shown, "[a] course of dealing between seller and buyer may 'ripen into an implied or informal agreement or under-

---

**12.** In *Dimmitt,* the defendant did not challenge the plaintiff's claim that its maximum possible market shares were 25% and 17% for the national cornstarch and national corn syrup markets. *See also American Telephoi.e and Telegraph Co. v. Delta Communications Corp.,* 408 F.Supp. 1075, 1106 (S.D.Miss.1976) *aff'd per curiam,* 579 F.2d 972 (5th Cir.1978), *modified on other grounds,* 590 F.2d 100 (5th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979) (TV networks did not monopolize as they provided less than 50% of the network business); *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1368 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977) (defendant not guilty of monopolization as a matter of law since share of ornamental plant market was only 20%); *Sulmeyer v. Coca Cola Co.,* 515

F.2d 835, 850 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976) (Coca Cola's 22% market share of all independent bottlers was insufficient to establish monopolization claim).

**13.** *United States v. United States Steel Corp.,* 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920) (no monopoly despite a market share of 50 percent).

**14.** Plaintiff's claim that Paragraph 10 of the Agreement afforded standing was properly rejected by the district court. Paragraph 10 merely stated the consequences if Transource chose to acquire an equity position in a gondola; it did not condition acquisition on compliance with Paragraph 8, the clause subject to challenge.

standing.'" *Dillon Materials Handling, Inc. v. Albion Industries,* 567 F.2d 1299, 1302 (5th Cir.1978), *cert. denied,* 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127 (1978), *citing McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 337 (4th Cir.1959). In this case, however, defendant submitted evidence persuasively showing that the transactions were not part of an ongoing relationship. The plaintiff did not submit any evidence to rebut this showing. On these facts, the district court correctly ruled that the Clayton Act was not violated by an express or implied restraint in the July 6 Agreement.

■ Finally, Transource complains that Trinity violated section 3 by refusing to allow Transource to sell or assign its right to purchase gondolas from Trinity to a third party.[15] The district court granted a summary judgment in favor of defendant on this claim as well. It correctly found that section 3 does not apply to restraints on either the resale of goods or the sale of the right to purchase goods. Section 3 does not prohibit a seller from restraining the disposition of a buyer's contractual rights. Section 3 was designed to promote competition with the seller. It merely outlaws a contract for sale that restricts a lessee or purchaser from dealing in the goods of a competitor of the lessor or seller. Since section 3 does not encompass plaintiff's claim, the district court's decision to grant summary judgment to defendant on this claim was proper.

## VI. State Law Claims

### A. *Pendent Jurisdiction*

We have determined that the district court correctly disposed of the plaintiff's federal antitrust claims by granting a summary judgment in favor of defendant on all of those claims. Plaintiff's only remaining claims are based on Texas state law. We note sua sponte that we must first determine whether the district court had subject matter jurisdiction over the state claims.[16] The issue is pendent jurisdiction since both plaintiff and defendant are Texas corporations and there is no diversity jurisdiction. 28 U.S.C. § 1332.

■ A district court may exercise pendent jurisdiction over a state law claim where the court already has jurisdiction over a "substantial" federal claim, where the state and federal claims derive from a "common nucleus of operative fact," and where the claims are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Silva v. Vowell,* 621 F.2d 640, 645 (5th Cir. 1980), *cert. denied sub. nom., Johnston v. Silva,* 449 U.S. 1125, 101 S.Ct. 941, 67 L.Ed.2d 111 (1981).

■ In the present case, the district court had jurisdiction to hear substantial federal antitrust claims under 15 U.S.C. § 1 and 2 (Sherman Act) as well as 15 U.S.C. § 14 (Clayton Act). These federal antitrust claims stemmed from activities relating to the June 15, 1979, Agreement. Similarly, plaintiff's state claims are grounded in the Agreement. Since the federal and state claims arise from a common nucleus of fact, we conclude that the district court had the discretion to exercise pendent jurisdiction over the state law claims.

■ We further conclude that the exercise of pendent jurisdiction was proper even after the district court eliminated the federal antitrust claims by summary judgment order.[17] The decision to exercise pen-

---

**15.** Under the July 6, 1979, Agreement, Transource had the right to purchase 250 gondolas from Trinity at a specified price. Transource wanted to sell its rights to purchase Trinity gondolas to XTRA, Inc., a railcar leasing company.

**16.** This issue was not briefed by the parties, but it is jurisdictional and we must decide it.

**17.** Although we affirm the district court order granting summary judgment for defendant on the federal antitrust claims, we nevertheless categorize the claims as "substantial" for purposes of pendent jurisdiction. The test of substantiality for this purpose is whether the federal claims are more than frivolous. *Jackson v. Stinchcomb,* 635 F.2d 462, 471 (5th Cir.1981).

**286**

dent jurisdiction is within the discretion of the district court. *Jackson v. Stinchcomb,* 635 F.2d 462, 473 (5th Cir.1981). "It is well-settled that the federal district court has the *power* to hear pendent state claims even though it has disposed of the federal claim that originally invoked its jurisdiction." [18] *Breen v. Centex,* 695 F.2d 907, 914 (5th Cir.1983),[19] *see also Hagans v. Lavine,* 415 U.S. 528, 545, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974), *Rosado v. Wyman,* 397 U.S. 397, 402, 90 S.Ct. 1207, 1212–14, 25 L.Ed.2d 442 (1970). We find no justification for denying pendent claim jurisdiction as to the state anti-trust and contract claims in this case because of their common nucleus of operative fact.

Since we have concluded that the district court had the power to hear the state law claims, only two questions remain. First, was summary judgment in favor of the defendant on the state law claims proper? Second, how should the state claims be dealt with upon remand?

### B. State Antitrust Claims

■ In addition to its federal antitrust claims, Transource also charged Trinity with violating Texas antitrust law, although it neglected to identify the state statutes that are involved or the conduct it considered to be illegal. At the pretrial conference, plaintiff merely stated that its state claims duplicated its federal claims. The district court found that the June 19, 1979, Agreement did not violate Texas' antitrust laws and ordered summary judgment for the defendant. We affirm this

judgment because, as the district court explained, Texas antitrust laws do not apply to marketing agreements but only regulate situations in which "one party sells products to another party and they agree to prohibit or restrict the purchase or resale of those products by or to other parties." *Llewellyn v. Borin,* 569 S.W.2d 946, 949 (Tex.Civ.App.—Texarkana 1978), (holding distributorship agreement which limited the distributor's sales territory did not violate Texas antitrust statutes). An individual acting alone, either personally or through a representative, may sell his products or services wherever and to whomever he pleases, and there is no violation of the antitrust statutes. *Ibid.*

■ Further, the noncompetition covenant in Paragraph 8 does not render the Agreement illegal. Under Texas law, "[s]uch agreements, if ancillary to an employment or agency contract, are valid unless they are unreasonable as to territory or duration." *Id.* at 950. After reviewing the record, we agree with the district court's conclusion that the noncompetition clause was reasonable in this case. The covenant in Paragraph 8 was limited in duration to the term of the Agreement [20] and significantly, Transource did not assert either in its brief or in the record that this time period was unreasonable.

### C. Breach of Contract

Transource claims that the district court erred in finding that the June 15, 1979, Agreement was unambiguous and in further finding as a matter of law that Trinity

**18.** Although courts have the power to hear pendent claims, in some cases it is more appropriate to dismiss the state claim when the federal cause of action has been eliminated. *See, e.g., Scranton Construction Co., Inc. v. Litton Industries Leasing Corp.,* 494 F.2d 778, 783 (5th Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

**19.** In *Breen v. Centex,* the district court entered summary judgment on the federal claims and subsequently dismissed the state claims without prejudice. On appeal, this Court remanded as it was unclear whether the district court had dismissed the state claim for lack of jurisdiction or whether the court dismissed the claim

simply as a matter of judicial discretion. This court held that if the dismissal was based on the latter reason, it would be reviewed on appeal under the "abuse of discretion" standard, but if the district court operated under the former rationale in dismissing the state claim, its decision constituted error. 695 F.2d at 914.

**20.** The second portion of Paragraph 8 provided for a five year non-competition period after termination of the Agreement, but only if the Agreement was terminated by Transource under Paragraph 11, which allowed termination after the delivery of 700 gondolas. This portion of the noncompetition clause never went into effect.

did not breach the terms of the contract. Transource alleges that Trinity breached the Agreement in two ways: (1) Trinity failed to post the letter of credit in favor of Valdunes and (2) Trinity failed to advance $20,000 working capital to Transource. In response, Trinity contends that (1) it was not obligated under the terms of the Agreement to post the letter of credit and (2) it did not breach its duty to advance the $20,-000 because Transource did not fulfill the prerequisite condition, supplying the Valdunes purchase order.

■ The basic problem in this case is that while both parties were fully cognizant of the fact that the letter of credit had to be posted by someone on the very same day that they signed their own Agreement, neither party took responsibility for posting the letter. As a result, the Valdunes purchase order was revoked. The ultimate question, then, with respect to both breach of contract claims is: which party had the duty to post the letter of credit under the terms of the June 15, 1979, Agreement? [21]

Transource contends that the contract placed the responsibility for posting the letter of credit on Trinity. It points to paragraph 3(b) of the Agreement which provides that:

> At the Closing, Transource will assign the purchase order contracts for the components to Trinity (or cause the suppliers thereunder to execute or reexecute such contract with Trinity on terms acceptable to Trinity) *and upon such assignments Trinity will succeed to all rights and obligations thereunder held by Transource.* (Emphasis added).

Transource maintains that Trinity's "obligations" under paragraph 3(b) included the duty to post the letter of credit.

Trinity, to the contrary, argues that the Agreement contained no express provision regarding the letter of credit and that consequently, the responsibility for posting the letter fell on Transource. Trinity contends that paragraph 3(b) cannot be construed to include the duty to post the letter of credit, since 3(b) does not set out a promise by Trinity. Instead, the provision is intended only to be a promise by Transource. Further, even Transource notes that the language in 3(b) speaks of obligations "held" by Transource and thus cannot refer to any obligation "owed" by Transource to Valdunes. Finally, Trinity argues that posting of the letter of credit was not an "obligation" at all, but was merely an "option." Trinity notes that the Valdunes purchase order stated that if the letter of credit was not posted, the purchase order would be deemed cancelled. Trinity urges that cancellation would not constitute breach of an "obligation" owed to Valdunes.

The district court agreed with the defendant's construction of the contract and further noted that under paragraph 3(a), the purchase order contracts had to be "enforceable" "upon execution." [22] Assuming that "execution" preceded "closing" of the Agreement, the district court concluded that any obligation to post a letter of credit must belong to Transource, since otherwise, the Valdunes purchase order would not be "enforceable" at execution. In addition, the district court pointed out that any obligations assumed by Trinity pursuant to paragraph 3(b) would only take effect if the contract "closed," not merely upon execution of the contract. Since Trinity never accepted the assignment of purchase orders, the district court concluded that the contract did not in fact close, thus relieving Trinity of any liability.

We have examined the Agreement, and we are unable to say as a matter of law that without ambiguity the contract assigns the duty of posting the letter of credit to a

---

**21.** If Trinity was obligated to post the Valdunes letter of credit, it could not support its decision to withhold the $20,000 advance with the excuse that Transource did not provide the Valdunes purchase order.

**22.** Paragraph 3(a) provides that:

> Upon execution, the purchase order contracts for the components set forth in Exhibit A will be the valid and binding obligations of Transource and, to the best of Transource's knowledge will be the valid and binding obligations of the parties thereto and enforceable in accordance with their respective terms.

particular party. *See Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 995 (5th Cir.1983) (determination of contract ambiguity is a question of law). Under Texas law, which controls in this case, "a contract is ambiguous when it is reasonably susceptible to more than one meaning, in the light of the surrounding circumstances and after applying established rules of construction." *Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir.1982); *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1979).

Contrary to the district court's conclusion, we find that both parties offered arguable interpretations of the terms of the Agreement. In reaching our conclusion that the Agreement is ambiguous as a matter of law, we take into consideration the entire contract as well as the circumstances surrounding the June 15 transaction.[23] *See Richland Plantation Co. v. Justiss-Mears Oil Co.*, 671 F.2d 154, 156 (5th Cir.1982); *Harris v. Rowe, supra*, at 306.

Since the district court determined that the Agreement was unambiguous, it declined to consider extraneous evidence of the parties' intent with respect to the contract terms. If "the court finds ... [a contract] unambiguous and integrated, parol evidence of a party's subjective intentions cannot be used to change the contract's meaning." *Pennzoil Co. v. Federal Energy Regulatory Commission*, 645 F.2d 360, 388 (5th Cir.1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). Since we conclude that the contract is ambiguous, on remand the district court should refer to extrinsic evidence to resolve ambiguity in the contract. *Scholz v. Heath*, 642 S.W.2d 554, 557 (Tex.App.—Waco 1982 *no writ*); *Jeanes v. Henderson*, 703 F.2d 855, 861 (5th Cir.1983).

Texas courts have repeatedly held that "[i]f there is any doubt as to the meaning of a contract ... the courts may consider the interpretation placed upon it by the parties

themselves." *Superior Oil Co. v. Stanolind Oil & Gas Co.*, 240 S.W.2d 281, 285 (Tex. 1951). With regard to the interpretation placed upon the contract by Trinity, Transource attempted to introduce the deposition of Kenneth Lewis, vice president of Trinity. When questioned about responsibility for posting the letter of credit, Lewis made the following remarks:

"Q. Okay. Now, has there been any discussions in advance of this closing about the Letter of Credit with Valdunes?

A. The letter, the need to put up a Letter of Credit?

Q. Yes. A. Yes. Q. And that took place how long before the June 15, 1979 closing?

A. I'm not certain. Several days, I would say.

Q. Okay. And Trinity was aware of the fact that a Letter of Credit needed to be posted; is that correct?

A. Yes.

Q. And Trinity undertook to do that as part of this agreement; is that correct?

A. We undertook to do it after the agreement was signed, yes.

Q. Well, you understood in advance of signing the agreement that it would be necessary for Trinity to post that Letter of Credit?

A. We understood that we would have to do it if the purchase order was assigned to us, absolutely."

Lewis' admission creates a factual dispute with respect to the meaning of the Agreement. The deposition casts doubt upon Trinity's contention that the parties did *not* agree Trinity was to post the letter of credit.

Transource also proffered evidence regarding the definition of "closing" intended by the parties. Transource attempted to introduce the deposition of Ray Wallace,

---

**23.** While we consider it unusual that Transource would obligate itself to post a $2,070,090 letter of credit when it possessed significantly limited financial resources, we also are puzzled by the idea that Trinity would sign an agreement obligating it to post such a letter of credit by that same evening.

president of Trinity, who made the following statements:

"Q. What's your understanding of when the closing took place?

A. When the signatures were there.

Q. Okay. And that would have been late in the afternoon on June 15, 1979?

A. That would be—yes.

Q. I believe you said late in the afternoon or, if I'm wrong, I didn't mean to—

A. I think that would be my recollection.

In response to additional questions, Mr. Wallace made these responses:

"Q. Well, you've testified your understanding was that Trinity was going to pay $20,000 at closing and you've testified they didn't do it.

A. I've testified we would do whatever the contract called for, yes.

Q. And doesn't it call for $20,000 at closing?

A. It calls for $20,000 at closing so long as TranSource is not in default.

Q. Well, the day wasn't over at closing, was it?

A. No.

Q. And you still had an opportunity to, at least, try to get the Letter of Credit posted, didn't you?

A. And we were trying."

These statements also create a factual dispute about the meaning of terms in the Agreement since, apart from this testimony, Trinity claims that "closing" never took place.

Although the initial determination of whether a contract is ambiguous is a question of law, if the contract is found to be ambiguous, determination of the parties' intent is a question of fact. *Richland Plantation Co. v. Justiss-Mears Oil Co., supra* at 156. In a motion for summary judgment "[a] court must not decide any factual is-

sues it finds in the record, but if such are present, the court must deny the motion and proceed to trial." *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982). "[O]nly when it is clear what the truth is and where no genuine issue remains for trial should summary judgment be granted." *Commercial Metals Co. v. Walker,* 439 F.2d 1103, 1104–05 (5th Cir.1971).

We find at least two genuine issues of disputed fact. Consequently, the case must be remanded to the district court so that the matter of breach of contract can be submitted to a jury.[24]

### D. *Novation*

In final defense of the district court's summary judgment, Trinity argues that even if it *did* breach the June 15, 1979, Agreement, no claim for damages is justified because that contract was superseded by the July 6, 1979, Agreement. Trinity claims that by operation of law, the June 15, 1979, Agreement was null and void upon execution of the July 6, 1979, Agreement and that any claim for breach of the first Agreement was vitiated.

In support of its argument, defendant cites several cases which hold that when one party breaches a contract and subsequently the parties agree to a new contract covering the same subject, any claims from the first contract are waived. *See, e.g., Wood v. Spray,* 297 S.W.2d 872, 874 (Tex. Civ.App.—Amarillo 1957). On the other hand, the Texas Supreme Court has said that "[i]n the absence of such inconsistent provisions of two contracts that both cannot stand, thereby working an implied novation, . . . a second contract will operate as a novation of a first contract only when the parties to both contracts intend and agree that the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first." *Chastain v. Cooper & Reed,* 257 S.W.2d 422, 424 (Tex. 1953).

---

**24.** The district court also made findings regarding plaintiff's estoppel and negligence claims. Since these claims are also based on the intent of the parties with respect to the duty to post the letter of credit, however, we leave their resolution to the district court on remand.

We cannot say as a matter of law that the June 15 Agreement and the July 6 Agreement were so inconsistent that they could not stand together. The June 15, 1979, Agreement was a parts supply and marketing contract. Transource agreed to supply purchase orders for components to Trinity and to secure orders for at least 250 completed gondolas from third party purchasers. The July 6, 1979, Agreement, on the other hand, was a pure contract of sale. In that contract, Trinity agreed to sell 250 gondolas to Transource outright. We cannot assume that the parties intended for the latter contract to operate as a novation of the former. While it is fairly clear that both parties considered the first contract inoperative, it is not at all clear that execution of the July contract grew out of the failure of the first contract. It was significantly different in nature and purpose. Nor can we conclude that the parties intended to eliminate any claims for damages from the June Agreement by executing the July Agreement.

Intent is usually a question of fact; it is only a question of law when reasonable minds cannot differ. We remand to the district court for a determination by a jury of the issue of intention of the parties to create a novation.

■ Since we reverse the district court's summary judgment only with respect to plaintiff's state law breach of contract claim, the question arises as to the retention by the federal court of the state law claim on remand. As we concluded earlier in this opinion, the district court acted within its discretion when it initially recognized pendent jurisdiction over Transource's state law claims. *United Mine Workers v. Gibbs, supra,* 86 S.Ct. at 1138. We further noted that this jurisdiction was not defeated when plaintiff's federal claims were eliminated by summary judgment. "Even at this stage of the proceeding, on remand, the district court has the discretion to retain or dismiss the state law claim." *Rheaume v. Texas*

*Department of Public Safety,* 666 F.2d 925, 931 (5th Cir.), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982). Keeping in mind any adverse impact a dismissal may have on the litigants,[25] the district court is free to decide the state law claim itself, or if it chooses, to defer in favor of a Texas state court.

In sum, we affirm the summary judgment denying Transource's antitrust claims, both federal and state, since we find as a matter of law that Trinity did not violate the antitrust statutes. We hold that the summary judgment denying Transource's state breach of contract claim was improper as a genuine issue of material fact existed which should have been submitted to a jury. Accordingly, we reverse the summary judgment as to the breach of contract claim and remand the case to the district court for proceedings in accordance with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

**25.** *See, e.g., Hensen v. Columbus Bank and Trust Co.,* 651 F.2d 320, 325 (5th Cir.1981) (fact that state law claim will become barred by statute of limitations is a factor in determining whether to exercise pendent jurisdiction).