**Lonnie C. HOOD, Plaintiff-Appellant,**

**v.**

**TENNECO TEXAS LIFE INSURANCE CO., Southwestern Management & Research Corp., et al., Defendants-Appellees.**

No. 83–2190.

United States Court of Appeals, Fifth Circuit.

Aug. 23, 1984.

Evans & Moses, Steven C. Barkley, Beaumont, Tex., for plaintiff-appellant.

Harry M. Reasoner, Page I. Austin, Karl S. Stern, Houston, Tex., Charles G. Barnett, Dallas, Tex., Dewey J. Gonsoulin, Beaumont, Tex., for defendants-appellees.

Before THORNBERRY, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a summary judgment in an antitrust suit. Plaintiff-appellant, Lonnie C. Hood, who had worked as a career agent for the Southwestern Life Insurance Company (Southwestern Life) for many years, was terminated by the company in September 1980. At about the same time, an affiliated company, Southwestern Management & Research Corporation (Southwestern Management), terminated Hood's employment as a registered representative selling mutual funds and other financial instruments.

Hood sued these companies and three others [1] in federal district court, alleging that his termination constituted a group boycott which substantially restrained competition in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and article 21.21, section 4(4) of the Texas Insurance Code. The district court, after reviewing the pleadings, depositions, and admissions on file, in addition to affidavits submitted by the parties, on March 1, 1983 granted defendants' motion for summary judgment on all of plaintiff's claims. We affirm.

## I.

### FACTS

Lonnie Hood became a career agent with Southwestern Life in its Beaumont branch office in 1953 and served in this capacity until his termination by the company in September 1980. In 1971 Hood also became a registered representative of Southwestern Management, an affiliated company of Southwestern Life which functions as a service company for Southwestern Life insurance agents who wish to sell mutual funds and annuities.

Although his contract with Southwestern Life provided that Hood would sell only its policies, in 1965 he began to sell policies for other companies. At the time of his termination, Hood had signed agreements with over twenty-five companies and did substantial business with these. He received formal permission from Southwestern Life to do so only on one occasion in 1971. The company, however, apparently did not strictly enforce its restrictions regarding brokering for other companies either as to Hood or as to its other agents.

By 1980 Southwestern Life's competitive position in the Beaumont area had deteriorated. Hood believed that the company

---

**1.** The others are Southwestern Investors, Inc., Southwestern Investors Income Fund, Inc., and Fund of the Southwest, Inc. There is no claim, however, that these companies were involved in Hood's termination.

was not competitive in certain areas of the market. He expressed his concerns to officers of the company as well as to other Southwestern Life agents.

In September 1980 Southwestern Life appointed a new manager, Thomas Martin, for the Beaumont branch office. Martin was told by James Cobb, a vice president of Southwestern Life, that the agency needed rebuilding in the form of new agents and increased production. Cobb also told Martin that Lonnie Hood placed a great deal of business outside Southwestern Life and that Hood had a negative attitude toward the company and its products. Shortly after assuming his new duties, Martin recommended the termination of Hood's agency contract. The company accepted his recommendation and on September 25, 1980 sent Hood a letter informing him of its decision. This letter, which was the first notice that Hood received regarding his termination, gave no reasons for the company's action.[2]

On October 6, 1980 Southwestern Management also sent Hood a notification that he had been terminated as a registered representative for that company. It was the usual policy of Southwestern Management to terminate a representative when that individual had also been terminated by Southwestern Life,[3] although some individuals under these circumstances had requested and been allowed to remain representatives of Southwestern Management. There is no evidence that Hood made such a request.

Hood initiated this suit on May 6, 1981 alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and alternatively, an illegal tying agreement in violation of

section 3 of the Clayton Act, 15 U.S.C. § 14. Subsequently, he amended his complaint to add a claim under article 21.21, section 4(4) of the Texas Insurance Code. The district court granted summary judgment on all claims. Hood appeals only his claims under section 1 of the Sherman Act and article 21.21 of the Texas Insurance Code. He does not appeal the district court's judgment on his Clayton Act claim.

## II.

### SUMMARY JUDGMENT

We are mindful that we review this case under the summary judgment standard. This standard is a strict one, allowing the entry of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c), *see, e.g., Transource International v. Trinity Industries, Inc.*, 725 F.2d 274, 279 (5th Cir.1984). Moreover, in considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 440 (5th Cir.1982). However, once the moving party makes an initial showing that no genuine issue of material fact exists, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e). In reviewing a summary judgment on appeal, we apply the same standard as that used by the district court. *Transource*, 725 F.2d at 279.

---

**2.** Later, in response to a letter from Hood's attorney, Southwestern Life stated that Hood's termination was due to the "fact that he was placing the majority of his business with another life insurance company and had ceased to be a representative primarily for Southwestern Life Insurance Company. ... Simply stated, Mr. Hood had, by his actions, ceased to be a career agent for Southwestern Life, and our notice of termination merely confirmed that point."

Hood's contract with Southwestern Life provided it could be terminated at any time by either party on written notice to the other.

**3.** One reason offered for this policy is that, under the rules of the National Association of Securities Dealers, an individual may work as a registered representative for only one company. The premise is that individuals leaving Southwestern Life would wish to become a representative of a securities firm associated with another life insurance company.

## III.

### FEDERAL ANTITRUST CLAIM

■ Hood's claim that Southwestern Life and Southwestern Management conspired to terminate him in violation of section 1 of the Sherman Act has been foreclosed by a recent decision of the Supreme Court, *Copperweld Corporation v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld* the plaintiff, David Grohne, had formed a new corporation, Independence Tube Company, that would compete in the steel tubing market with Regal Tube Company,[4] a wholly owned subsidiary of Copperweld Corporation. Obviously concerned about this new competitor, Copperweld and Regal Tube took a number of steps to discourage those contemplating doing business with Independence Tube.[5]

A jury found that Copperweld and Regal Tube had violated section 1 of the Sherman Act through these concerted activities and the Seventh Circuit affirmed. The Supreme Court reversed, however, holding that a parent corporation and its wholly owned subsidiaries are legally incapable of conspiring with each other in violation of section 1 of the Sherman Act. In so holding, the Court rejected in large part[6] the "intra-enterprise conspiracy doctrine," a doctrine applied to allow recovery under the Sherman Act for the coordinated acts of a parent and its subsidiary. The Court expressed as the basis for its decision the unity of purpose shared by the parent and its subsidiary:

"A parent and its wholly owned subsidiary have a complete unity of interest.... With or without a formal 'agreement,' the subsidiary acts for the benefit of its parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny."
*Id.* at ——, 104 S.Ct. at 2742.

Hood's claim of a section 1 violation concerns the termination of his contract as an agent, a decision that he alleges was jointly made by Southwestern Life and Southwestern Management. Each of these companies, however, is a wholly owned subsidiary of a common parent corporation—Tenneco. *Copperweld* teaches us that because they share a common purpose with Tenneco they cannot conspire with their parent in violation of the Sherman Act. By the same token, neither can they conspire with one another. In light of *Copperweld*, therefore, we must affirm the grant of summary judgment on Hood's federal antitrust claim.[7]

## IV.

### STATE ANTITRUST CLAIM

■ In addition to claiming a violation of federal antitrust law, Hood alleges that the termination of his contract violated article 21.21, section 4(4) of the Texas Insurance Code.[8] Tex.Ins.Code Ann. art. 21.21 § 4(4) (Vernon 1981). This section states:

---

4. Before its acquisition by Copperweld, Regal Tube was an unincorporated division of Lear Siegler, Inc. Grohne served as president of this division.

5. For example, they sent to parties with whom Grohne was attempting to deal a letter warning of their intent to protect their rights under the terms of their purchase agreement and to protect the trade secrets purchased from Lear Siegler. After receiving this letter, Yoder Company canceled a contract with Grohne under which the former was to supply a tubing mill. Copperweld and Regal Tube also contacted banks that were considering financing the new company as well as prospective suppliers and customers of Independence Tube.

6. The Court reserved the question of whether a parent company may conspire with an affiliated company it does not wholly own.

7. Thus, we do not directly address the merits of Hood's federal claim, as such, apart from the *Copperweld* rule, although, as shown by the discussion of his state law claim, the result would be the same.

8. The district court had jurisdiction over this pendent state claim. *See Transource International v. Trinity Industries, Inc.*, 725 F.2d 274, 285–86 (5th Cir.1984).

"Sec. 4. The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

" . . . .

"(4) Boycott, Coercion and Intimidation. Entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance; . . ."

We affirm the district court's grant of summary judgment on this state law claim asserted by Hood.

At the onset, we are uncertain that Texas law would even recognize the claim asserted by Hood and for much the same reason as expressed by the Supreme Court in *Copperweld*. Texas courts have held that a statutory combination or concerted action in violation of the state antitrust laws cannot occur unless those combining are independent and in competition with one another. *See State v. Fairbanks-Morse & Co.*, 246 S.W.2d 647, 658–59 (Tex. Civ.App.—Dallas 1952, writ ref'd n.r.e.). "Our Supreme Court from early times has ruled that a statutory combination cannot exist unless the two or more persons are independent and capable of acting in competition with one another . . . ." *Padgitt v. Lone Star Gas Co.*, 213 S.W.2d 133, 136 (Tex.Civ.App.—Dallas 1948, no writ). While these courts were interpreting articles 7426–7428, the predecessor statutes of the general Texas antitrust laws, rather than the insurance code provision at issue in this case, it is probable that the Texas courts would apply the same reasoning to claims such as that made by Hood. Under this reading of Texas law, Southwestern Life and Southwestern Management, which are neither "competitors" nor independent, cannot combine or act in a concerted manner.

We decline, however, to rest our holding on this interpretation. While *Fairbanks-*

*Morse* suggests broadly that those charged with combining in restraint of trade must be capable of acting in competition with one another, the decision in *Padgitt* indicates this requirement applies only to trusts, as the court in that case considered the merits of a claim of conspiracy between a gas company and a customer. Moreover, while we believe that these decisions do reflect a requirement that those conspiring be "independent,"[9] we cannot be certain at this point that the Texas courts would apply the rule expressed by the Supreme Court in *Copperweld* regarding subsidiaries of a common parent. This is particularly true as that case at least arguably effected a change from the previous practice and as we have found no Texas case that specifically addresses this issue. For these reasons, we address the merits of appellant's state claim apart from *Copperweld*.

Our task is hampered somewhat by the paucity of cases discussing section 4(4) of article 21.21; research has yielded only one—*Russell v. Hartford Casualty Insurance Co.*, 548 S.W.2d 737 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.). In *Russell* the plaintiffs claimed that their insurer had violated this provision by attempting to "coerce and intimidate" them through the cancellation of a rental car agreement. The Texas Court of Civil Appeals rejected this claim and affirmed summary judgment for the defendant, stating that the purpose of section 4(4) is "to prevent monopoly or unreasonable restraint in the business of supplying insurance." 548 S.W.2d at 742. While this decision shows that Texas would not apply this provision to every unfair or potentially intimidating act by an insurer, it does not express the standards to be used in assessing a violation of the section.

The parties both contend, however, that this Court should apply the test under section 1 of the Sherman Act, 15 U.S.C. § 1, in assessing Hood's claim. We agree, finding support for this approach in *Russell,* which

---

9. *See also Albin v. Isotron Corporation,* 421 S.W.2d 739 (Tex.Civ.App.—Texarkana 1967, writ ref'd n.r.e.).

shows that the Insurance Code provision is aimed at antitrust violations, and in the common purpose reflected in the two statutes—to prevent concerted anticompetitive conduct.[10]

## SHERMAN ACT ANALYSIS

■ *Per Se* **Restraint Of Trade.** Hood first contends that his termination by Southwestern Management and Southwestern Life was a horizontal boycott and thus constituted a *per se* violation.[11] He argues that through their actions the Tenneco subsidiaries sought to send a message to remaining Southwestern Life agents to stop brokering the products of other insurance companies. For this reason, he argues, his termination was intended to harm other insurance companies which compete on the same level with Southwestern Life in the Beaumont area. While conceding that Hood's termination was due to his low production for Southwestern Life,[12] defendants contend that their action was justified and, in any event, did not violate the antitrust laws. We find no *per se* restraint.

■ First, it is established that horizontal combinations in restraint of trade are "agreements among *actual competitors* which restrain competition at the same level of distribution." *Transource International v. Trinity Industries, Inc.*, 725 F.2d 274, 279 (5th Cir.1984) (emphasis added). Southwestern Life and Southwestern Management, however, are not actual competitors. The former is an insurance company and sells only insurance products; the latter is a broker/dealer in securities and sells mutual funds and variable annuities. Moreover, the record reflects that Southwestern Management functioned as a service company for Southwestern Life agents; its purpose was to enable them to sell products they could not otherwise offer.[13]

Second, in any event, we find no horizontal component in the termination of Hood by the two companies. Neither company competes with Hood. Hood has not alleged and shown to be a co-conspirator any individual, such as another agent, who is independently a competitor of Hood; nor has he alleged and shown that the asserted conspiracy had as a purpose or effect the restriction of competition among agents who were his competitors. In *Blackburn v. Crum & Forster*, 611 F.2d 102, 104 (5th Cir.), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980), this Court, in considering a similar contention by a terminated insurance broker, found that the case "contains no horizontal aspect, but involves only a vertical action undertaken by suppli-

---

**10.** Supporting this conclusion is the fact that the wording of article 21.21, section 4(4), while differing from that of section 1 of the Sherman Act, is quite similar to the wording in the McCarran-Ferguson Act. This act generally exempts the insurance industry from regulation under the federal antitrust laws including the Sherman Act. 15 U.S.C. § 1012(b). There is an exception to this general exemption: the Sherman Act remains applicable "to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b). This Court has analyzed claims of boycotts by insurance companies under the test applied for violations of section 1 of the Sherman Act. *Blackburn v. Crum & Forster*, 611 F.2d 102 (5th Cir.), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980). *See also St. Paul Fire and Marine Ins. Co. v. Barry*, 438 U.S. 531, 541, 98 S.Ct. 2923, 2929, 57 L.Ed.2d 932 (1978).

**11.** Horizontal agreements are ordinarily considered illegal *per se* " 'because of their pernicious effect on competition and lack of any redeeming virtue.' " *Transource*, 725 F.2d at 279, quoting *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Where a *per se* violation has occurred, the plaintiff is not required to show any anticompetitive effects; these are presumed. *Id.*

**12.** From January to September 1980 Hood earned $7,168 in commissions for new business from Southwestern Life; his first year's commissions with all other companies totaled $36,851 during this same time period. His earnings for renewals from January to September were $6,530 and $9,480 respectively. Hood had voluntarily moved from the Southwestern Life branch office in Beaumont in June 1980 because he was placing much of his business with other companies.

**13.** Thus we reject Hood's contention, made during oral argument, that the two companies competed because each offered products relevant to financial planning and security.

ers, the insurance company defendants, against their agent ...." *Cf. Black v. Nationwide Mutual Insurance Co.,* 429 F.Supp. 458 (W.D.Pa.1977), *aff'd,* 571 F.2d 571 (3d Cir.1978) (no antitrust violation in termination of insurance agent by three related insurance companies). Hood's termination did not constitute a horizontal boycott.[14]

■ **Rule of Reason.** Because we have concluded that there was no horizontal restraint of trade, we must analyze Hood's claim under the rule of reason. *Transource* at 280; *Muenster Butane, Inc. v. Stewart Company,* 651 F.2d 292, 295 (5th Cir.1981). "The rule of reason inquiry focuses on the competitive significance of a particular restraint ...." *Hornsby Oil Company, Inc. v. Champion Spark Plug Company,* 714 F.2d 1384, 1392 (5th Cir. 1983). To recover under this rule, the plaintiff must show that the defendant's actions adversely affected competition in the appropriate product and geographic markets. *Id.* Hood has failed to show sufficient anticompetitive effect to prevail on his claim.

■ It is undisputed that there was vigorous competition in Beaumont between the twenty to thirty companies selling life insurance there.[15] Further, Hood does not dispute that Southwestern Life's share of the overall ordinary life insurance business in that city was less than five percent[16] and that entry or expansion into the market was not difficult. This is significant as we have held that the termination of a dealer by a supplier lacking market power cannot have an adverse effect on competition. *See Carlson Machine Tools, Inc. v. American Tool, Inc.,* 678 F.2d 1253, 1259–60 (5th Cir.1982) (affirming summary judg-

ment against terminated distributor where manufacturer's market share never exceeded ten percent); *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111 (5th Cir. 1979) (summary judgment in case involving termination of a sales representative).

Hood argues, however, that the relevant market in his case was not the entire life insurance business in Beaumont, but rather a discrete market consisting of professional men over the age of forty. He contends that Southwestern Life had a market share of approximately twenty-five percent in this market. It is true, of course, that defining a market is an important consideration in an antitrust action. We have said that market considerations provide the "objective benchmarks" for determining a section 1 violation. *Hornsby Oil,* 714 F.2d at 1393. And it is also true that "[w]ithin a broad product market, economically significant submarkets may exist which in themselves constitute product markets." *Id.* at 1393.[17]

Hood's showing on this theory, however, is wholly insufficient. His statement is that this twenty-five percent of the market share of executives and professionals over forty in the Greater Beaumont Area consists of those who "either were or had been policyholders of Southwestern Life." This figure, therefore, does not represent a market share at a particular point in time, but rather is a cumulative figure representing a total number of policyholders over some unknown period of time. We must infer that the twenty-five percent figure is overstated as to any particular relevant time. Moreover, Hood does not show how his termination impacted competition. He merely points to figures showing that brokering by Southwestern Life agents with

---

**14.** Nor is there any other basis for finding a *per se* violation. *See E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

**15.** Both Hood and his expert witness testified that the life insurance business in the Beaumont area was intensely competitive.

**16.** The record reflects that Southwestern Life's overall share of ordinary life insurance in Texas

at this time was 2.33 percent; its share of group insurance in that state was .67 percent.

**17.** "The outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes ... and the ability of other existing products or new entrants to expand output ...." *Hornsby Oil,* 714 F.2d at 1393.

one company—Philadelphia Life Insurance Company—increased significantly in 1980 (to $128,518 from $8,812 in 1979) and decreased to $58,203 in 1981, the year following his termination. We have no information that shows a link between Hood's termination and the decline in brokering by Southwestern Life agents with this one particular company. Nor do we have any information regarding whether Philadelphia Life was unable to sell its products through other agents. In addition, Hood has failed entirely to show how this one-year decline in brokering by Southwestern Life agents with a single insurance company has impacted the product market he seeks to define. His argument * MESSAGE(S) *MORE SECTIONS FOLLOW- seems to be that Philadelphia Life would no longer be privy to the customer lists of Southwestern Life and, thus, could not penetrate the over-forty executive-professional market. The latter conclusion, however, is entirely speculative. The antitrust laws, moreover, do not require companies to share this type of information. Finally, Hood has conceded that Southwestern Life could enforce the provision in its contracts with its agents requiring them to sell only its products. The anticompetitive effects of this action would be no different, however, than those claimed by Hood as a result of his termination. *Cf. Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1007 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) (finding no antitrust violation where the defendant could have attained the same results through a lawful means as it accomplished by an allegedly illegal means).

Given the admittedly vigorous competition in Beaumont and the ease of entry into the market, there is simply no showing, beyond mere speculation, that Hood's termination, even if we infer some effect on brokering by other Southwestern Life agents, either had or was calculated to have any anticompetitive effect. Hood has thus failed to provide adequate evidence of anticompetitive effect to raise a material fact issue and to preclude summary judgment under the rule of reason.

## V.

### CONCLUSION

In sum, we find that Hood's federal antitrust claim has been foreclosed by the Supreme Court's decision in *Copperweld* because Southwestern Life and Southwestern Management are wholly owned subsidiaries of a common parent company. In addition, we find that he has failed to prevail on his state law claim. For these reasons, we affirm the decision of the district court.

**AFFIRMED.**