**HEIL–QUAKER CORPORATION, Keeprite Inc., & Inter–City Gas Corporation, Appellants,**

v.

**The MISCHER CORPORATION & Mischer Enterprises, Inc., Appellees.**

No. C14–91–00819–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 16, 1993.

Rehearing Denied Nov. 10, 1993.

**212**

Stephen D. Susman, Robert Rivera, Jr., Neal S. Manne, Houston, for appellants.

Tom Alexander, Kevin J. McEvily, Robin C. Gibbs, Paul J. Dobrowski, Robert N. Brailas, Houston, for appellees.

Before JUNELL, ROBERTSON and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

Heil–Quaker Corporation, KeepRite Inc., and Inter–City Gas Corporation appeal from the trial court's judgment awarding appellees $3,345,585.58. Appellants bring six points of error challenging the jury's finding of tortious interference with contract and the awards of actual and punitive damages. Appellees bring a single cross-point challenging the trial court's refusal to submit requested issues on breach of contract. Because we find error with respect to the actual and punitive damages assessed against Heil–Quaker, we reverse the judgment with respect to the awards of actual and punitive damages against Heil–Quaker. We affirm the remainder of the judgment.

Appellee, Mischer Enterprises, Inc., is a subsidiary of appellee, The Mischer Corporation.[1] Mischer Enterprises was engaged in the wholesale distribution of air-conditioning products. Inter–City Gas Corporation (ICG) is the parent of KeepRite, a Canadian manufacturer of heating, refrigeration, and air-conditioning products. In 1984, ICG and KeepRite began negotiating with Mischer about the formation of a joint venture to manufacture and distribute home air-conditioning products. A Letter Agreement, dated August 19, 1985, described the basic structure of the business relationship. Under this agreement, KeepRite was to build an air conditioning equipment manufacturing facility, known as KMO, for the design and production of a new KeepRite product line. Mischer was to receive an option to purchase up to 49% of the KMO shares. In consideration of the option, Mischer was to purchase all of its requirements for residential split air conditioners and heat pumps from KMO and

---

1. Appellees will be hereinafter collectively re- ferred to as "Mischer."

would have the sole right to distribute KMO products in Texas and Louisiana.

In August 1986, ICG began negotiating with Whirlpool Corporation for the acquisition of Whirlpool's subsidiary, Heil–Quaker, a manufacturer of residential air conditioning products whose distributors were direct competitors of Mischer. Years earlier, Mischer had been a distributor of Heil–Quaker equipment, but problems had arisen and they ended their business relationship by mutual agreement. According to Thomas F. Huntington, a former KMO employee, Heil–Quaker personnel had mentioned to KeepRite employees that Mischer still owed Heil–Quaker $1 million for past warranty claims. During negotiations with ICG, some Heil–Quaker distributors mentioned their concerns about Mischer. At a meeting in December 1986, Chuck Shattuck of Heil–Quaker called Mischer "the fucking whores of the market." Tom Huntington, of KeepRite, testified that he had heard the term "whores" used to describe distributors or dealers who sell at very low prices.

In 1986, Mischer experienced reduced demand for the residential split air conditioning products, resulting in a less than anticipated demand for KMO products. Mischer testified, however, that KeepRite failed to furnish a complete line of KMO products and that this lack of products resulted in a 25–30% drop in Mischer's residential sales. Huntington testified that KeepRite had made a commitment to Mischer to provided 9 SEER (seasonal energy efficiency ratio) condensing units, heat pumps, coils, air handlers, and a higher SEER unit to be developed. Mischer representatives advised KeepRite about the problems caused by the incompleteness of KMO's product line and by the failure to meet product schedules. By October 1986, both parties were disappointed with the business arrangement. KeepRite was unable to supply Mischer with all the products Mischer needed and Mischer was not buying as many 9 SEER units as originally predicted. KeepRite hoped the Heil–Quaker acquisition would help fill the product voids.

Harry Forrest, President of KeepRite, gave Mischer two alternatives: (1) KMO would go forward with the joint venture if Mischer would agree to drop the stock option from 49% to 20%, drop the margin sharing agreement, agree to purchase a minimum of 30,000 units in 1988, and accept less than the complete product line promised in the 1985 agreement; or (2) Mischer could accept a distributorship arrangement. Forrest also wanted Mischer to pay KeepRite $1 million for the products received. Mischer did this upon entering a repurchase agreement by which KeepRite was required to repurchase all KMO equipment if the relationship terminated.

In December 1986, ICG formally acquired Heil–Quaker. In August 1987, Heil–Quaker, KeepRite, and Mischer entered into an agreement, called the "Private Brand Agreement." This agreement gave Mischer no ownership option and expressly stated that it superseded any prior agreements between the parties. Walter Mischer claimed that he signed this agreement because he had sustained heavy losses and was desperate for products. KMO later stopped credit and shipments to Mischer based on Mischer's poor financial condition. Mischer went into liquidation about one year after entering the private brand agreement. Mischer then filed this suit.

The case was tried to a jury. Based on the jury verdict and the trial court's rulings with respect to Heil–Quaker's counterclaim, the court entered judgment in favor of Mischer in the amount of $1,010,000.00 on Mischer's claims against KeepRite, and $2,335,585.58 on Mischer's claims against Heil–Quaker.

In points of error two and three, appellants challenge the sufficiency of the evidence supporting the submission of a jury issue on tortious interference with business relations and supporting the judgment on this claim. Because the parties were performing under a contract, appellants contend that no evidence can support the finding of tortious interference with business relations, which involves interference with prospective contractual relations and not interference with an existing contract. Furthermore, appellants contend there was no evidence supporting the finding of tortious interference because Heil–Quaker became legally incapable of tortiously inter-

fering with KeepRite's business relations after KeepRite signed the letter of intent to acquire Heil–Quaker in August 1986. We turn first to appellants claim that Heil–Quaker presented no or insufficient evidence of interference with a prospective contract.

■ In reviewing a claim of no evidence, we must consider only the evidence and inferences tending to support the finding, disregarding all contrary evidence and inferences. *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). If there is any evidence of probative force to support the finding, we must uphold it. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989). Where the appellant challenges the factual sufficiency of the evidence supporting a finding, we must consider all of the evidence and set aside the verdict only if the evidence is too weak to support the finding, or if the answer is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

In their Third Amended Original Petition, appellees pled tortious interference with contract and tortious interference with business relations. After appellees presented their evidence, appellants moved for a directed verdict on various claims. The trial court granted the motion for directed verdict on appellees' claim of tortious interference. Following the presentation of appellants' evidence, the trial court decided to submit a jury issue on tortious interference. The issue submitted to the jury was as follows:

> Do you find from a preponderance of the evidence that Heil–Quaker tortiously interfered with Mischer Corporation's business relations with KeepRite, Inc., if any?
>
> You are instructed that tortious interference is committed if:
>
> (1) business relations exist;
>
> (2) that same was willfully and intentionally interfered with and motivated by malice;
>
> (3) that said interference was a proximate cause of damages to Mischer Corporation; and
>
> (4) that actual damages occurred.
>
> Answer "Yes" or "No."
>
> *ANSWER:*

> *Yes*

Appellants contend that, at all relevant times, appellees were parties to a contractual relationship with KeepRite. Thus, they argue that the evidence does not support a cause of action for tortious interference with business relations, which they believe constitutes tortious interference with prospective contractual relations. We disagree.

■ Tortious interference with business or prospective contractual relations concerns business relations that have not yet been reduced to a contract or to a continuing business relationship not amounting to a formal contract. *See* RESTATEMENT OF TORTS (SECOND) § 766B, comment a, c (1979). To establish a cause of action for interference with prospective contractual relations, the plaintiff often must prove, among other elements, "a reasonable probability that the parties would enter into a contractual relationship." *Barker v. Brown,* 772 S.W.2d 507, 511 (Tex.App.—Beaumont 1989, no writ); *CF & I Steel Corp. v. Pete Sublett and Co.,* 623 S.W.2d 709, 715 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ denied). A formal contractual relationship, however, is not always required. According to the Restatement, the expression "prospective contractual relation" should not be strictly construed. RESTATEMENT OF TORTS (SECOND) § 766B, comment c (1979). The instruction submitted to the jury in this case does not include the element of a reasonable probability the parties would enter into a contract. Instead, the instruction requires only the existence of business relations and interference with those relations. Thus, this issue could extend to tortious interference with a continuing business relationship involving or not involving a formal contract.

■ Appellant next claims that Heil–Quaker became legally incapable of tortiously interfering with Mischer's relationship with KeepRite after KeepRite signed the August 1986 letter of intent to acquire Heil–Quaker. On August 28, 1986, ICG, KeepRite's parent corporation, and Whirlpool entered into a formal Letter of Intent for ICG to acquire Heil–Quaker. The acquisition was completed on December 19, 1986. Appellants argue

that the Letter of Intent was a binding contract and it created a unity of interest that made tortious interference impossible. In the trial court, however, appellants argued that there could be no tortious interference after December 19, 1986.

In *Copperweld Corp. v. Independence Tube Co.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent corporation and its wholly-owned subsidiary are incapable of conspiring under the Sherman Act. The court noted that a parent and its wholly-owned subsidiary have a complete unity of interest and thus, must be viewed as a "single economic unit." *Id.* at 772 n. 18, 104 S.Ct. at 2742 n. 18. Texas courts have adopted the *Copperweld* reasoning in tortious interference claims. *See American Medical Int'l, Inc. v. Giurintano*, 821 S.W. 331 (Tex.App.—Houston [14th Dist.] 1991, no writ). The Fifth Circuit has extended *Copperweld* to find a unity of interest between two subsidiaries of a common parent. *Hood v. Tenneco–Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984).

Although we agree with *Hood* that there is a unity of interest between two subsidiaries of a common parent, Heil–Quaker did not become a subsidiary of ICG until December 19, 1986. Thus, we hold that Heil–Quaker had no unity of interest with KeepRite until December 19, 1986. Heil–Quaker was capable of tortiously interfering with Mischer's business relations with KeepRite before that date. Accordingly, we must determine whether there is any evidence of tortious interference by Heil–Quaker before December 19, 1986.

█ Under the August 19, 1985 letter agreement, Mischer was to have an option to purchase up to 49% of the KMO shares. Mischer was to purchase all of its requirements for residential split air conditioners and heat pumps from KMO beginning in July 1986. The record shows, however, that Mischer's relationship with KeepRite began deteriorating in 1986. KeepRite was unable to supply all the KMO products Mischer needed and Mischer was not buying as many condensing units as originally predicted. In August 1986, KeepRite sought to acquire Heil–Quaker to increase the availability of certain products, including items that Mischer needed. An internal KeepRite memo, dated September 24, 1986, stated that certain Heil–Quaker employees had "mentioned the bad experience they had with the Mischer operation and the apparent lack of integrity when they were dealing with them." Heil–Quaker personnel also complained to KeepRite that Mischer had at one time defrauded Whirlpool (Heil–Quaker's parent company) of $1,000,000.00 in warranty claims. In October 1986, KeepRite began contemplating a reduction in the amount of stock Mischer would have an option to purchase. A draft stock option agreement, dated October 20, 1986, provided that Mischer would have an option to purchase only 20% of the KMO stock, rather than the 49% contemplated under the August 1985 agreement.[2]

Although this evidence indicates a deterioration in Mischer's relationship with KeepRite, it does not indicate that this deterioration resulted from any intentional acts by Heil–Quaker. Given that we may only consider evidence of what transpired between the parties until December 19, 1986, we find that there is no evidence of any actions by Heil–Quaker that could constitute tortious interference. Therefore, we sustain points of error two and three.

In point of error one, appellants contend the punitive damages awards must be overturned because the awards of actual damages are not supported by legally or factually sufficient evidence. Appellants assert that Mischer presented evidence of damages resulting from breach of contract and fraud, two claims the jury rejected. The jury found Heil–Quaker liable for tortious interference with Mischer's business relations with KeepRite and found KeepRite liable for breach of fiduciary duty. Thus, appellants primarily contend Mischer failed to produce any evi-

---

**2.** Eventually, KeepRite gave Mischer two alternatives: (1) continue under the terms of the August 1985 agreement with a commitment that Mischer would take products in the quantities agreed upon in August 1985; or (2) Mischer could operate as an independent KMO distributor with an option to purchase only 20% of the KMO shares.

dence of damages flowing from the findings of tortious interference or breach of fiduciary duty. Because we have found no evidence supporting the tortious interference finding against Heil–Quaker, the actual damages award against them cannot stand and we need not address the sufficiency of the evidence supporting that award.

■ Having already set out the standards of review for challenges to the legal and factual sufficiency of the evidence, we need not repeat them here. We turn to the findings against KeepRite. The jury awarded Mischer $10,000.00 in actual damages for KeepRite's breach of fiduciary duty. The record contains Mischer's testimony that the failure of the joint venture caused the failure of his business. Mischer further testified that he had invested $11 million in attempting to perform under the joint venture agreement. Appellees' damage expert, Martin Hanan, testified that if KeepRite had performed its obligations under the joint venture agreement, Mischer would have obtained benefits of over $50 million. Hanan further testified that if Mischer had never been involved with KeepRite, Mischer's business would have been worth over $50 million.

Appellants argue that Hanan's calculation, based on what Mischer would have been worth had the parties never met, is not evidence of breach of fiduciary duty, "since its entire hypothetical premise was that Mischer and KeepRite had no business relationship, fiduciary or otherwise." Appellants contend that this "if the parties had never met" approach is purely a fraud theory of damages and is inappropriate for breach of fiduciary duty. As to the second approach used by Hanan, appellants argue that this "benefit of the bargain" approach is only applicable where there was a breach of contract.

Even if we were to hold the damage models presented by Mischer's expert were improper, there would still be sufficient evidence to uphold the jury's award. Mischer's testimony that his business was destroyed and that he lost $11 million is more than sufficient to support the jury's finding of $10,000.00 in actual damages. We overrule point of error one.

■ In point of error four, appellants claim the trial court erred in cumulating the jury's two duplicative $1.5 million punitive damage awards against Heil–Quaker. Appellants rely on *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361 (Tex.1987) for the proposition that two awards of punitive damages should not be cumulated where the two torts supporting the awards involve a single course of conduct. In *Birchfield*, the jury awarded one sum for the actual damages resulting from both the acts of negligence and the deceptive acts or practices. *Id.* at 367. Appellees counter that, in this case, there are separate findings of actual damages in this case and thus, *Birchfield* is inapplicable. We disagree.

The jury found KeepRite liable for breach of fiduciary duty and assessed actual damages of $10,000.00 and punitive damages of $1,000,000.00. The jury then found Heil–Quaker liable for knowingly participating in KeepRite's breach of fiduciary duty. There was no issue on actual damages for Heil–Quaker's participation. Rather, the jury was asked to assess only exemplary damages for this participation and they awarded $1,500,000.00 in such damages. Although these two awards of exemplary damages were assessed against two different parties, they were based on the same finding of actual damages and this implicates the *Birchfield* rule against double recovery. Furthermore, punitive damages may not be awarded in the absence of a finding of actual damages. TEX. CIV.PRAC. & REM.CODE ANN. § 41.003 (Vernon Supp.1993). *See also Wright v. Gifford–Hill & Co., Inc.*, 725 S.W.2d 712, 714 (Tex.1987). No actual damages were awarded for Heil–Quaker's participation in KeepRite's breach of fiduciary duty and there could be no award of exemplary damages against Heil–Quaker based on the actual damages assessed against KeepRite.

Appellees contend that Heil–Quaker is liable for the actual damages resulting from KeepRite's breach of fiduciary duty because Heil–Quaker participated in this breach. Although the jury found such participation, the judgment does not hold Heil–Quaker jointly and severally liable for the actual damages awarded for the breach of fiduciary duty by

KeepRite. Instead, the judgment holds KeepRite solely liable for these actual damages. Absent a judgment holding Heil–Quaker jointly and severally liable for the actual damages awarded for breach of fiduciary duty, we hold that punitive damages could not be awarded against Heil–Quaker for their participation in this breach. We sustain point of error four.

Appellants also claim that the evidence regarding Heil–Quaker's actions constituted a single course of conduct upon which the jury apparently found liability both for knowing participation in KeepRite's breach of fiduciary duty and for tortious interference. Thus, appellants maintain that multiple awards of exemplary damages are not justified simply because the jury found the single course of conduct satisfied the elements of two torts. Having previously held that there was no evidence supporting liability for tortious interference, the awards of actual and punitive damages for this claim must also fall. Therefore, we need not determine whether Heil–Quaker's actions constituted a single course of action.

 In points of error five and six, appellants claim that the awards of punitive damages are not reasonably proportioned to the actual damages awarded and that the awards violate the Due Process Clause because the jury was not given proper guidance and because the awards are excessive. We turn first to the constitutional challenge under point of error five.

Appellants cite *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991) for the proposition that punitive damages awards violate due process if the jury was not given proper guidance. In *Haslip*, the Court noted that unlimited jury or judicial discretion in the assessment of punitive damages might "invite extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. at 1043. Thus, "general concerns of reasonableness and adequate guidance from the court ... enter into the constitutional calculus." *Id.* The *Haslip* jury was instructed that punitive damages were not to compensate the plaintiff, but were for the purposes of punishment and deterrence. *Id.* at 19, 111

S.Ct. at 1044. The jury was also advised to consider "the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." *Id.* The Court held these instructions satisfied due process for the following reasons:

> The instructions thus enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory.

*Id.* The Court then examined the instruction in light of Alabama's post-trial procedures for scrutinizing punitive damages awards. *Id.* The Court held that application of these standards imposed meaningful constraints on the jury's discretion and ensured that the awards bore a relationship to the compensatory damages and that the punitive award was not grossly disproportionate to the severity of the offense. *Id.* at 21, 111 S.Ct. at 1045.

In this case, the charge defined exemplary damages as "an amount which you may, in your discretion, award as an example to others and as a penalty or by way of punishment in addition to any amount which you have found as actual damages." Appellants contend this instruction is virtually indistinguishable from an instruction held inadequate in *Mattison v. Dallas Carrier Corporation*, 947 F.2d 95 (4th Cir.1991).

In *Mattison*, the jury was provided with the following instruction:

> The amount of punitive damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and deter it and others from like conduct.

*Id.* at 100. Relying on *Haslip*, the Fourth Circuit looked to the state appellate standards of reviewing punitive damages awards to determine whether there were meaningful constraints on a jury's discretion. *Id.* at 105. Because the only state standard of appellate review of punitive damages was whether the award was excessive, the court held that the broad discretion given to the jury to award these damages was not adequately checked

by court review. *Id.* Accordingly, the court found a due process violation. *Id.*

We disagree with appellant's contention that *Mattison* is on point with this case. We find that the instruction given to the jury in this case was adequate under *Haslip*. This instruction advised the jury of the nature and purpose of punitive damages as punishment and deterrence. This instruction also informed the jury that the imposition of punitive damages was not compulsory. Although the instruction held inadequate in *Mattison* is similar to the one given here, *Mattison* notes that the *Haslip* court also looked to the state appellate standards of review to determine if there were any meaningful constraints on jury discretion. In *Mattison*, the court found no meaningful constraint because South Carolina law only provided for a factual review of the evidence to determine if the award was excessive. Texas law, however, requires that the exemplary damage award be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). To determine whether the award of exemplary damages is reasonable, the Texas Supreme Court has set forth five factors to consider:

(1) the nature of the wrong,

(2) the character of the conduct involved,

(3) the degree of culpability of the wrongdoer,

(4) the situation and sensibilities of the parties concerned, and

(5) the extent to which such conduct offends a public sense of justice and propriety.

*Id.* We conclude that the application of these standards imposes a sufficiently definite constraint on the jury's discretion in awarding exemplary damages.

 Appellants next complain that the exemplary damage awards violate the Due Process Clause because they are unreasonable and grossly excessive. In *Haslip*, the

court refused to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* 499 U.S. at 18, 111 S.Ct. at 1043. Instead, the court preferred to employ a standard of reasonableness and an approach to review that examines the relationship between the actual and exemplary damages. *Id.*

In a more recent case, the Supreme Court backed away from employing an approach that focuses entirely on the relationship between actual and punitive damages. *TXO Prod. Corp. v. Alliance Resources Corp.*, —— U.S. ——, ——, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993). Instead, the court held it appropriate "to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* In *TXO*, the punitive damages were 526 times greater than the actual damages awarded. *Id.* at ——, 113 S.Ct. at 2717.[3]

Because we have held that there is no evidence of tortious interference by Heil–Quaker, we need not address the punitive damages awarded for this tort. Similarly, we need not address the award of punitive damages for Heil–Quaker's participation in KeepRite's breach of fiduciary duty because we have overturned this award. The only award left to review is the award of punitive damages for KeepRite's breach of fiduciary duty. This award was 100 times the actual damages awarded against KeepRite.

Based on the actual damages awarded, the jury may have believed that KeepRite's breach of fiduciary duty harmed, but did not destroy, Mischer's entire business. The jury also could have believed that KeepRite forced Mischer to accept an option to purchase a smaller percentage stock ownership in KMO, an act that could have resulted in

---

**3.** Appellant urges us to consider the Supreme Court's analysis in *Haslip*, in which the Court said that a punitive damages award of more than four times the amount of compensatory damages in an insurance fraud case "may be close to the line," but "does not cross the line into the area of constitutional impropriety." *Haslip*, 499 U.S. at 24, 111 S.Ct. at 1046. Based on the reasoning in *TXO*, however, the disparity between the amounts awarded as actual damages and as punitive damages is not a prime factor in determining excessiveness. *See TXO*, —— U.S. at ——, 113 S.Ct. at 2721.

less profits for Mischer in the future. Although the jury found the actual damage to Mischer slight, it could have considered the magnitude of potential harm to Mischer or to other potential joint venturers that might have resulted had such future behavior not been deterred. We do not consider the disparity between the actual damages and the punitive damages so grossly excessive as to violate the Due Process Clause. We overrule points five and six.

■■■ Appellees raise one cross-point claiming the trial court erred in refusing to submit a jury issue on breach of contract. In objecting to the charge, appellees counsel sought breach of contract issues in addition to those regarding a joint venture agreement because of the more complex requirements to establish a joint venture. Illustrative of their argument to the trial court is the following excerpt:

> The joint venture agreement issue does not solve that problem, and here is why. If it were determined by an appellate court that we had not satisfied as a matter of law the joint venture or the jury, for that matter, didn't find that we had satisfied the higher requirements for a joint venture agreement, we might still here satisfy the requirements of a straight vanilla contract as reflected in # 31 and # 32.

The jury did receive an issue on the existence of a joint venture agreement and whether there was a breach of such agreement. The jury found the existence of a joint venture agreement, but found no breach. Thus, appellees' primary fear, that the jury would not find the existence of a joint venture agreement because of the stringent requirements was not realized.

Appellants also counter that this cross-point is rendered moot by the jury's finding of a novation. In special issue number 20, the jury received the following question and instruction:

> Do you find from a preponderance of the evidence that the private brand agreement identified as Plaintiffs' Exhibit # 186 constituted a novation as that term is herein defined?

> You are instructed that a novation occurs when a new agreement between the parties is substituted for an existing agreement and discharges or supersedes all rights and duties under the original agreement.

> Answer "Yes" or "No."

> *ANSWER:*

> *Yes*

The effect of a novation is to extinguish an existing obligation and to substitute a new obligation. *Longhorn Flying Club, Inc. v. Dragoo,* 464 S.W.2d 189, 194 (Tex.Civ.App.— Austin 1971, writ ref'd n.r.e.). Because the jury found the existence of a joint venture agreement, the finding of a novation related to the joint venture agreement. We agree with appellants that the jury's finding of a novation renders appellees' argument moot. Appellees do not challenge the sufficiency of the evidence supporting the jury's finding of a novation. Consequently, we find no error by the trial court in refusing to submit a jury issue on the existence and breach of a "plain vanilla" contract. We overrule appellants' cross-point.

Having found no evidence to support the finding of liability for tortious interference by Heil–Quaker and having found no basis for imposition of punitive damages for Heil–Quaker's participation in KeepRite's breach of fiduciary duty, we reverse the judgment and remand the cause to the trial court for a reformation of the judgment as to Heil–Quaker, consistent with this court's opinion. We affirm that portion of the judgment pertaining to KeepRite.

JUNELL, J., not participating.